SKC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson, | No. CV 19-00401-TUC-RM |
| Plaintiff, | |
| v. | **ORDER** |
| United States of America, | |
| Defendant. | |

Plaintiff Jeremy Pinson, who is currently confined in the United States Penitentiary ("USP")-Tucson, brought this civil rights action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2761−80. Defendant United States of America moves for summary judgment. (Doc. 46.) Plaintiff was informed of her[1] rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 48), and she opposes the Motion (Doc. 49). Defendant filed both a Reply and a Reply in Support of Statement of Facts. (Doc. 51, 52.)[2]

The Court will grant in part and deny in part the Motion for Summary Judgment.

. . . .

. . . .

---

[1] Plaintiff is transgender and uses feminine pronouns.

[2] Defendant's Reply in Support of Statement of Facts violates Local Rule of Civil Procedure 56.1(b), which states that "no reply statement of facts may be filed." Accordingly, Defendant's Reply in Support of Statement of Facts will not be considered.

**I. Background**

On screening of Plaintiff's four-count First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an FTCA claim in Count One against Defendant United States of America. (Doc. 210.) The Court directed Defendant United States of America to answer this claim and dismissed the remaining claims and Defendants. (*Id.*)

Plaintiff's FTCA claim is based on injuries she allegedly sustained "as a result of her use of prohibited razors to harm herself" on two separate occasions while housed in the USP-Tucson Special Housing Unit ("SHU"). (Doc. 21 at 5−6.) Plaintiff alleges that, on July 21, 2020, Officer Shields gave her a razor, which Plaintiff showed to Officer Wade, threatening suicide, and Officer Wade encouraged her to commit suicide and left her unsupervised in her cell. (Doc. 21 at 7.) Plaintiff then "lacerated her body with the razor, losing large amounts of blood, which pooled outside her cell and onto the tier in sight of a dozen inmates," but Officer Wade did not summon psychological or medical attention for Plaintiff. (*Id.*) Plaintiff also alleges that, on September 14, 2020, "after once again being given a razor," she cut herself 243 times on her arms, legs, neck, and face, and officers saw what she was doing but did nothing to stop her and did not summon a psychologist or medical provider to examine her. (*Id.*)

**II. Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the

nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Facts**

From February 15, 2018 through December 4, 2020, Plaintiff was incarcerated at the USP-Tucson. (Doc. 47 (Def.'s Statement of Facts) ("DSOF") ¶ 2.)[3] From June 13, 2019 to October 23, 2019, she was housed in the SHU, then released from the SHU as part of a negotiated settlement in a different case. (Doc. 21 at 6.)[4] On January 17, 2020, after being assaulted, Plaintiff was returned to the SHU. (*Id.*)[5]

---

[3] When Defendant filed its Motion, Plaintiff had been moved to USP-Coleman in Coleman, Florida, but the docket shows she has since been returned to USP-Tucson, which is where the events alleged in this action occurred. (DSOF ¶ 1; Doc. 21; Doc. 53.)

[4] Record citations refer to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

[5] Defendant did not provide any facts about the SHU in its Statement of Facts. According to public information available online, prisoners in Bureau of Prisons custody are housed in the SHU either for "administrative detention" when removal of the prisoner from the general population is needed "to ensure the safety, security, and orderly operation of correctional facilities, or protect the public," or for "disciplinary segregation," which is imposed "as a sanction for committing a prohibited act(s)." U.S. Dep't of Justice, Fed.

### A.     July 21, 2020 Incident

On July 21, 2020, following the discovery of blood in Plaintiff's cell and "range" in the SHU, Plaintiff was visually searched by two officers, who found no visible wounds or bleeding, and she was brought to the SHU medical unit, where she was examined by EMT-P Dereck Van Praag.  (DSOF ¶ 3; Doc. 47-2 at 16.)  According to the medical record of this encounter, Plaintiff had no visible injuries or bleeding, but she had dried blood on the nares of her nose, indicating a previous nosebleed.  (Doc. 47-2 at 18.)  SHU staff told Van Praag that Plaintiff's cellmate reported Plaintiff had punched herself in the nose to make herself bleed (*id.*), though when Van Praag asked Plaintiff what caused the nosebleed, Plaintiff told him she had headbutted the door of her cell.  (DSOF ¶¶ 5−7; Doc. 49-1 (Pl.'s Statement of Facts) ("PSOF") ¶ 6.)  Plaintiff has a history of self-inflicted nosebleeds.  (DSOF ¶ 8.)  According to Plaintiff, the medical officer conducting this exam only noted the nosebleed and left without completing his medical exam, and although he said he would come back, he never returned.  (PSOF ¶ 5.)  Plaintiff also states that she had cut her neck, left wrist, and scrotum.  (*Id.*)

Prior to this incident, Plaintiff filed an Administrative Grievance complaining that she could not shave her face with electric hair trimmers, so Lieutenant Campbell directed Officer Shields to provide her razors, and Officer Shields gave her two clear plastic disposable razors.  (Doc. 47-3 at 8−9 (Pl. Dep. at 6:17−7:9).)  Officer Shields then took Plaintiff to a dry cell to shave, but he did not collect the razors back from her before returning her to her cell, and Plaintiff had the razors for one or two weeks prior to July 21, 2020, when she claims she broke the plastic off a razor and used the blade to "lacerate"— meaning she made "fairly deep cut[s]" to—her neck, left wrist, and scrotum.  (Doc. 47-3 at 10 (Pl. Dep. at 8:16−23).)

### B.     September 15, 2020 Incident

Sometime before September 14, 2020, Officer Vasquez retrieved a manilla envelope from another prisoner's cell, and after examining and removing some of its contents, he

---

Bureau of Prisons, *Special Housing Units*, §§ 541.22 *available at* https://bop.gov/policy/progstat/5270.11.pdf (last visited August 5, 2022).

- 4 -

delivered the envelope to Plaintiff through the slot in her cell door. (DSOF ¶ 32; Doc. 47-3 at 16, 20 (Pl. Dep. at 24:21−25, 28:4−22).) The remaining items in the envelope consisted of postage stamps, "an entirely intact new dark green Bic double-bladed razor," and half a bag of coffee. (Doc. 47-3 at 20−21, 23 (Pl. Dep. at 28:23−29:1, 31:1−4)).) Plaintiff and the other prisoner exchanged possessions almost daily when they were housed on the same range. (Doc. 47-3 at 22 (Pl. Dep. at 30:9−12).) Under SHU policy, "[r]azors are controlled by SHU staff" and "[o]nly disposable razors are used." (Doc. 49-1 (Pl. Statement of Additional Facts (PSAF)) ¶ 2; Doc. 49 at 17−18.) At this time, SHU prisoners were not permitted to possess razors. (Doc. 49 at 66.)

On September 14, 2020, Psychologist Dr. Samantha Licata performed a Suicide Risk Assessment on Plaintiff because Plaintiff "endorsed thoughts of self-directed violence." (DSOF ¶ 12; Doc. 47-4, Ex. C (Licata Decl.) ¶¶ 1, 6.) Dr. Licata noted that Plaintiff was frustrated with her housing status and just needed to vent, but following Dr. Licata's assessment, Plaintiff felt better, was "highly future oriented," and while Plaintiff had discussed thoughts of self-directed violence, the thoughts were not realistic but were "grandiose and directly related to her venting." (Licata Decl. ¶ 6.) Dr. Licata determined that suicide watch was not warranted. (*Id.*)

On September 15, 2020, Dr. Licata went to Plaintiff's cell in the SHU because Plaintiff had engaged in self-harm. (DSOF ¶ 17; Doc. 47-4, Ex. C (Licata Decl.) ¶ 7.) Plaintiff reported that she had cut herself 243 times to create a "visual" for "the people on Thursday," meaning the Executive Staff, of the number of days Plaintiff had spent in the SHU. (DSOF ¶ 21; Licata Decl. ¶ 7.) Plaintiff explained that, during rounds the previous week, the Executive Staff had invalidated Plaintiff's complaints of having been held in the SHU for nearly 250 days and did not "fully understand the gravity of her situation." (Licata Decl. ¶ 8.) Plaintiff reported using a quarter of a loose razor blade, which she turned over to staff upon request. (Licata Decl. ¶ 9.)

Plaintiff showed Dr. Licata numerous cuts, mostly on her right calf, but also above her left eyebrow and on her left hand, wrist, and forearm, many of which were less than

one inch long and all of which were superficial. (DSOF ¶ 22; Doc. 47-4, Ex. C (Licata Decl.) ¶ 7.) Dr. Licata did not count the cuts, which were not bleeding and did not require stitches. (DSOF ¶ 23.) Plaintiff disputes that the cuts were superficial, claiming that Dr. Licata did not examine her whole body and that, while Plaintiff was cutting herself, Officer Celix saw she was bleeding, and after questioning her about what she was doing, Celix left, saying he would inform the Lieutenant. (PSOF ¶¶ 22−23; Doc. 47-3 at 24 (Pl. Dep. at 32:24−35:5).) Plaintiff also claims she got blood all over her clothes, and her cellmate "was somewhat upset about the experience." (Doc. 47-3 at 26 (Pl. Dep. at 34:23−25).)

Dr. Licata again performed a Suicide Risk Assessment, and Plaintiff explicitly denied suicidal ideation, intention, and plan, stating that her actions had been goal-directed with an intention of bringing attention to her long confinement in the SHU. (DSOF ¶¶ 19−20; Doc. 47-4, Ex. C (Licata Decl.) ¶ 9.) Plaintiff disputes that she denied suicidal ideation and claims she was "highly and seriously depressed, anxious, and feeling hopeless." (PSOF ¶ 19; Doc. 49 at 16 (Pl. Decl.) ¶ 20.)

Dr. Licata assessed the lethality of Plaintiff's injuries as low and found implicit and explicit evidence that Plaintiff did not intend to kill herself. (Doc. 47-4, Ex. C (Licata Decl.) ¶ 7.) This included that Plaintiff requested antibiotic ointment to use on her cuts, which Dr. Licata found "indicative of life preservation." (DSOF ¶ 25; Licata Decl. ¶ 11.)[6]

As Dr. Licata finished her assessment, Plaintiff told her, "It just pisses me off that they send you. You cannot control or influence what I do. My issue isn't with you, and I want to see the people I have an issue with. I'm royally . . . pissed off." (DSOF ¶ 28; Licata Decl. ¶ 10.)

The next day, September 16, 2020, Executive Assistant Enoch Jackson made rounds in the SHU, and when Plaintiff showed him her cuts, Jackson said "Tough shit. Don't come to the SHU," and kept walking. (DSOF ¶ 30; Doc. 47-3 at 24 (Pl. Dep. at 32:4−21).)

---

[6] Plaintiff blanketly denies this and other facts regarding her reason for cutting herself, but in support, she cites only to her declaration testimony that she was anxious and depressed, which does not create a genuine issue of material fact that she cut herself to protest the number of days she had been held in the SHU or that she subsequently requested antibiotic ointment to treat her cuts. (*See* PSOF ¶¶ 25−27.)

On September 17, 2020, Mental Health Treatment Staff exchanged emails regarding Plaintiff, one of which stated that Plaintiff "continues to struggle and made 243 cuts on her leg for each day she has been in the SHU." (PSAF ¶ 18; Doc. 49 at 63). Plaintiff has a history of self-directed violence, including that, in May 2018, she stabbed her forearm seven times with the tip of a pen, and on several occasions in 2019 and 2020, she gave herself self-inflicted nosebleeds. (DSOF ¶ 29; Doc. 47-4 at 17.)

Prior to her transfer to USP-Tucson, Plaintiff had been on suicide watch 35 times in Bureau of Prisons custody. (PSAF ¶ 19; Doc. 49 at 65.) From 2013 until her transfer to USP-Tucson, Plaintiff had been at Mental Health Care Level 4 multiple times. (*Id.*)

## IV.  FTCA/Negligence Legal Standards

### A.  FTCA

Under the FTCA, the United States may be held liable for injury caused by the negligent act of an employee under circumstances where a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b); *see Sosa v. Alvarez–Machain*, 542 U.S. 692, 700 (2004) ("[t]he FTCA 'was designed . . . to render the Government liable in tort as a private individual would be under like circumstances'") (quotation omitted).

### B.  Negligence

To state a negligence claim under Arizona law, a plaintiff must allege sufficient facts to support the following four elements: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (internal citations omitted).

A duty is an obligation that is recognized by law. *Id.* Under Arizona law, a duty may arise from a special relationship between the defendant and the plaintiff, including between a jailer and a prisoner. *See Wertheim v. Pima County*, 122 P.3d 1, 4 (Ariz. App. 2005). Where there is a jailer-prisoner relationship, the standard of care for the jailer is to take reasonable action to protect the prisoner against unreasonable risk of physical harm.

1 *Gipson*, 150 P.3d at 230; *see* also *Fedie v. Travelodge Int'l, Inc.*, 782 P.2d 739, 741 (Ariz. App. 1989); *Restatement (Second) of Torts* §§ 314A, 320. A correctional officer is therefore "under an obligation to use some care to avoid or prevent injury to [prisoners]." *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 368 (Ariz. 1985).

Whether a defendant has exercised the care required to satisfy his duty is generally a question of fact for the jury, *Walker v. Montgomery Ward & Co.*, 511 P.2d 699, 702 (Ariz. App. 1973), and a court must not conclude as a matter of law that no breach occurred unless "no reasonable juror could conclude that the standard of care was breached . . . ." *Gipson*, 150 P.3d at 230 n.1.

Causation requires showing that the breach was both the cause-in-fact and the legal or "proximate" cause of the alleged injury. *Boisson v. Arizona Bd. of Regents*, 343 P.3d 931, 934 (Ariz. App. 2015). Cause-in-fact exists "if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act." *Ontiveros v. Borak*, 667 P.2d 200, 205 (Ariz. 1983) ("the general rule is that a defendant may be held liable if his conduct contributed to the result and if that result would not have occurred 'but for' defendant's conduct."). Legal or proximate cause requires showing an unbroken, foreseeable chain of events between the defendant's actions and the ultimate harm. *Id.* Thus, even where cause-in-fact is shown, a defendant may not be held liable for the plaintiff's alleged injuries if the causal chain is broken or superseded by an intervening cause that is "both unforeseeable and extraordinary." *Id.*

**V.  Discussion**

    **A.  June 21, 2020 Incident**

Defendant argues that Plaintiff cannot prevail on her FTCA claim based on the alleged negligence of Officer Shields in giving her disposable razors and failing to retrieve them after use, because Plaintiff's claim that she lacerated herself with a razor on June 21, 2020 is flatly contradicted by the record evidence, which shows Plaintiff had no injury that day other than a nosebleed, caused either by her punching herself in the nose or headbutting

- 8 -

the door of her cell. (Doc. 46 at 7.) Defendant argues that, based on this record, the Court is not required to believe Plaintiff's account, and her claim fails as a matter of law. (*Id.*)

In her verified Complaint and deposition testimony, Plaintiff claimed that, on June 21, 2021, she "lacerated her body with the razor" and made "fairly deep cut[s]" to her neck, left wrist, and scrotum, causing her to lose "large amounts of blood." (Doc. 21 at 7; Doc. 47-3 at 10 (Pl. Dep. at 8:13−23).) Plaintiff does not deny, however, that she gave herself a nosebleed that same day, either by punching herself in the nose or by headbutting the door of her cell, and she does not claim that the medical record evidence from EMT-P Van Praag, finding only dried blood on the nares of her nose and no other visible injuries, was falsified. Even though Plaintiff claimed in her deposition that, after investigating her nosebleed, Van Praag did not complete his medical exam, she does not explain how her alleged "deep cuts" were treated, and she does not claim—nor is there any evidence to support—she ever requested or received any medical care for deep cuts, such as bandages, stitches, or antibiotic ointment. Plaintiff has also not claimed or produced any evidence that cutting herself deeply in multiple places, including on her neck and wrist, left any visible scabs or scars.

Absent additional facts, Plaintiff's testimony about her injuries from allegedly cutting herself with a razor on June 21, 2021 is too conclusory and unsupported by evidence in the record to create a genuine issue of material fact that she suffered any actual injury due to cutting herself with a razor that day. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact"); *see also Anderson*, 477 U.S. at 250 (for a dispute to be genuine, the evidence must be such that a reasonable jury could return a verdict for the nonmovant).

Because Plaintiff cannot show she injured herself with a razor on June 21, 2021, *Gipson*, 150 P.3d at 230, her underlying negligence claim based on Officer Shields's alleged negligence in giving her razors that he then failed to retrieve fails as a matter of law and cannot support her FTCA claim.[7] The Court will therefore grant summary judgment to Defendant to the extent Plaintiff's FTCA claim rests on the June 21, 2020 incident.

### B. September 15, 2020 Incident[8]

Defendant argues that it is entitled to summary judgment to the extent Plaintiff's FTCA claim based on the September 15, 2020 incident relies on Executive Assistant Jackson's alleged comment, "Tough Shit. Don't come to the SHU," when Plaintiff showed Jackson her cuts the next day, because Jackson "did not cause something [to happen] that had already happened." (Doc. 46 at 8.) Defendant is correct. Even if, in responding this way, Jackson breached a duty of care to Plaintiff, absent a causal link to any alleged harm, Plaintiff cannot show negligence, and Jackson's alleged response is insufficient to support an FTCA claim.

As to Officer Vasquez, Defendant does not dispute, and therefore appears to concede, that (1) Vasquez had a duty to protect Plaintiff from harm, (2) Vasquez breached this duty of care when he delivered Plaintiff an envelope from another prisoner containing a razor, and (3) Plaintiff suffered actual damages when she cut herself with a broken off part of the blade from this razor. The record supports that, due to the special relationship between a correctional officer and prisoner, Vasquez had a duty to show reasonable care to protect Plaintiff from harm. Further, a reasonable jury could find that Vasquez breached

---

[7] Although Defendant did not address Plaintiff's allegations that she showed the razor to Officer Wade, threatening suicide, and Officer Wade encouraged her to commit suicide, Plaintiff's failure to create a genuine issue of material fact that she actually injured herself with the razor after she showed it to Wade also defeats this claim.

[8] In her Complaint, Plaintiff alleged she cut herself on September 14, 2020, but the undisputed facts show that Dr. Licata performed a Suicide Risk Assessment on Plaintiff on September 14, 2020, and Dr. Licata was summoned to Plaintiff's cell after Plaintiff cut herself the next day, September 15, 2020. (DSOF ¶¶ 12, 17.) The Court will therefore use these dates when discussing this incident.

- 10 -

this duty when he delivered an envelope from another prisoner to Plaintiff, knowing from his own inspection that the envelope contained a prohibited razor, and that Plaintiff suffered actual damages when she cut herself 243 times.

Defendant argues, however, that Plaintiff cannot establish that receiving the razor was the but-for cause of Plaintiff's injuries because, had she not obtained a razor, Plaintiff could have made superficial cuts with something else, including writing implements, noting that she had previously injured herself with a pen. (Doc. 46 at 8−9.) Defendant also argues that Plaintiff cannot show that her injuries were proximately caused by Officer Vasquez's conduct because "no one could foresee Plaintiff's decision to make 243 superficial cuts in protest for being housed in the SHU." (*Id.* at 8.) Defendant maintains that this behavior constitutes an "extraordinary action" that no one would expect when someone has a disposable razor. (*Id.* at 8−9.)

For a plaintiff to show cause-in-fact, a "[d]efendant's act need not have been a 'large' or 'abundant' cause of the final result; there is liability if the result would not have occurred but for defendant's conduct, even if that conduct contributed 'only a little' to plaintiff's injuries." *Ontiveros*, 667 P.2d at 205 (internal citation omitted). In most cases, "cause-in-fact remains a question for the jury." *Id.*

Although, as Defendant argues, Plaintiff has a history of self-harm and could have injured herself in many other ways, such as by headbutting her cell door to make her nose bleed or by stabbing her arm with a pen, there is no evidence she had access to a pen or any other device with which she could have cut herself 243 times, as the evidence shows she did here, if she had not had access to a razor or other similar cutting implement that was forbidden to prisoners in the SHU. Because a razor is specifically designed to cut, a reasonable jury could also find that Plaintiff would not have inflicted these injuries or made such a substantial number of cuts "but for" obtaining a razor, as she was able to do here through the actions of Officer Vasquez. There is, therefore, a question of fact whether Vasquez's breach of his duty of care when he gave Plaintiff an envelope containing a disposable razor contributed in even in a small way to Plaintiff's decision to harm herself

in this way and was the but-for cause of her injuries.

Additionally, even if it was not reasonably foreseeable to Officer Vasquez that Plaintiff would use a broken off blade from the disposable razor to cut herself 243 times, this does not mean it would not have been reasonably foreseeable to Vasquez that providing Plaintiff a razor, which violated SHU policy, would result in Plaintiff or another prisoner using the blade to inflict harm on themselves or others.

The Arizona Supreme Court has recognized in the "dram shop" context, wherein a tavern owner who serves alcohol to patrons may be held liable for vehicular accidents caused by those who drink to intoxication, that "[c]ommon sense, common experience and authority all combine to produce the irrefutable conclusion that furnishing alcohol, consumption of alcohol and subsequent driving of a vehicle which is then involved in an accident are all foreseeable, ordinary links in the chain of causation leading from the sale to the injury." *Ontiveros*, 667 P.2d at 207. The court went on to recognize that the same principle applies in many situations: "For instance, one who lends an automobile or dangerous instrument to an inexperienced or intoxicated person may be held liable for injuries inflicted by that person upon another." *Id.* at 209 (citing cases).

So too here, even without evidence showing Officer Vasquez knew Plaintiff had a history of self-harm, a reasonable jury could conclude that a reasonable officer in Vasquez's position would have been aware that providing a razor to a prisoner in the SHU would create an unreasonable risk of harm, even if he could not have reasonably foreseen the precise nature of the harm that would occur. This conclusion is bolstered by the existence of prison policy that restricts SHU prisoners' access to razors, suggesting that such items are well-known or commonly believed by prison officials to pose inherent risks of harm that are reasonably foreseeable to correctional officers in the SHU. Even though Plaintiff engaged in her own harmful conduct, which ultimately caused her injuries, this is not enough to break the causal chain of events going back to her obtaining the razor from Officer Vasquez because, as in the dram shop context, "the common law recognizes a duty to take affirmative measures to control or avoid increasing the danger from the conduct of

others." *Ontiveros*, 667 P.2d at 208−09. Additionally, the Arizona Supreme Court has recognized that "the existence of an unreasonable risk of harm . . . becomes most obvious when the actor has reason to know that he is dealing with persons whose characteristics make it especially likely that they will do unreasonable things." *Id.* (quoting W. Prosser, *Handbook on the Law of Torts* § 33, at 172 (4th ed. 1971)) (internal quotation marks omitted). On this basis, a reasonable jury could find it reasonably foreseeable to a correctional officer in Vasquez's position that passing along a razor to a prisoner in the SHU, where such items are prohibited, would create an unreasonable risk of harm.

Because a reasonable jury could find that providing Plaintiff a razor in the SHU breached Officer Vasquez's duty of care, and this breach was both the but-for and proximate cause of Plaintiff's injuries, the Court will deny Defendant's Motion for Summary Judgment on Plaintiff's FTCA claim based on Vasquez's alleged negligence.

**IT IS ORDERED:**

(1) Defendant United States of America's Motion for Summary Judgment (Doc. 46) is **granted** in part to the extent Plaintiff's FTCA claim is based on her alleged injuries on June 21, 2020, but the Motion is otherwise **denied**.

(2) This action is referred to Magistrate Judge Leslie A. Bowman to conduct a settlement conference on Plaintiff's FTCA claim based on the injuries she allegedly incurred on September 15, 2020.

(3) Defense counsel must arrange for the parties to jointly call Magistrate Judge Bowman's chambers at (520) 205-4500 within **fourteen (14) days** of this Order to schedule a date for the settlement conference.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

(4)     The parties' deadline for filing a Joint Proposed Pretrial Order is extended until **thirty (30) days** after the parties' settlement conference.

Dated this 19th day of August, 2022.

_____
Honorable Rosemary Márquez
United States District Judge