**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson, | No. CV-19-00401-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

On September 12 and 13, 2023, the Court held a bench trial in the above-captioned matter. (Docs. 125, 128.) Plaintiff Jeremy Pinson and Defendant United States of America each submitted proposed findings of fact and conclusions of law. (Docs. 126, 127.) The Court finds that, as a matter of law, Officer Vasquez breached his duty of care to take reasonable action to protect Plaintiff against unreasonable risk of harm. The United States is liable for negligence.

**I.    Background**

Plaintiff filed a First Amended Complaint alleging four counts of constitutional violations pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, based on events that occurred while she[1] was confined in the United States Penitentiary ("USP")-Tucson. (Doc. 21.)[2] On screening under 28 U.S.C. § 1915A(a), the

---
[1] Plaintiff is transgender and uses feminine pronouns. The Court will do the same.
[2] Plaintiff, who has been in Bureau of Prisons' custody since 2006, is serving an aggregate 252-month term of imprisonment for various crimes, including Mailing Threatening Communications, False Statement, Threat to a Juror, and Threats Against the President.

Court determined that Plaintiff stated an FTCA claim in Count One against Defendant United States of America. (Doc. 20.) The Court directed Defendant United States of America to answer this claim and dismissed the remaining claims and Defendants. (*Id.*) The Court subsequently granted in part and denied in part Defendant's Motion to Dismiss and Motion for Summary Judgment. (Docs. 45, 54.) Plaintiff's remaining FTCA claim is based on injuries she inflicted upon herself using a prohibited razor allegedly given to her by Officer Vasquez, an employee of the Bureau of Prisons ("BOP") assigned to the Special Housing Unit ("SHU"). (Doc. 126 at 1-3.)

**II.   Factual Findings[3]**

   **A.   Plaintiff's History of Self-Directed Violence**

Plaintiff has a history of suicidal ideation and self-directed violence. (Doc. 47-2 at 13; Doc. 47-4 at 17; Doc. 54 at 7; Doc. 137 at 59, 67.) At the time of the incident at issue, Plaintiff had been subject to over 100 Suicide Risk Assessments, had been placed on suicide watch 40 times, and she was designated a "Care Level 2" mental health inmate.[4] (Doc. 47-4 at 17; Doc. 127 at 2; Doc. 137 at 59, 67, 117.) Plaintiff was assigned to the SHU for her protection after being assaulted. (Doc. 54 at 3; Doc. 138 at 63-65.)

   **B.   Razor Policy**

Razors are not permitted in the SHU at USP-Tucson, although they are allowed in USP-Tucson's general population and SHUs generally under the BOP's national policy. (Doc. 126 at 1; Doc. 127 at 3; Doc. 137 at 77; Doc. 138 at 29.) The no-razor policy at USP-Tucson's SHU was implemented with the intent to reduce incidents of inmates harming themselves with razors. (Doc. 137 at 77; Doc. 138 at 29-30.) To prevent razors from entering the SHU, prison staff put inmates through a "Secure Pass," a whole-body scanning machine, like an X-ray machine, that can detect contraband hidden in a body

---

(Doc. 47 at 1; Doc. 47-2 at 13.)
[3] These findings are based on the briefing underlying the motion to dismiss and summary judgment Orders (Docs. 45, 54), the transcripts of the bench trial (Docs. 137, 138), and the parties' proposed findings of fact and law (Docs. 126, 127).
[4] The BOP's mental health classification system classifies inmates from Care Level 1 to Care Level 4, with Care Level 4 inmates requiring the highest level of services. Fed. Bur. of Prisons Clinical Practice Guidance, Care Level Classification, May 2019.

cavity; scan inmates with hand-held metal detectors; strip and pat search inmates; inspect inmates' clothing, food trays, and property; and require inmates to change clothes when entering the SHU. (Doc. 127 at 3; Doc. 137 at 136-137; Doc. 138 at 29, 57-58.) Despite these security measures, razor blades and portions of razor blades still enter and circulate throughout the SHU. (Doc. 127 at 3; Doc. 137 at 122-123; Doc. 138 at 13, 16, 30, 70.) Plaintiff was subjected to these security measures upon her admission to the SHU, and the screening did not reveal that she possessed a razor. (Doc. 126 at 1-2; Doc. 137 at 17-18.)

### C. Plaintiff Obtains a Razor

Plaintiff's former cellmate, Rene Ellis, Jr., testified at trial that he possessed "a lot of contraband," including "multiple razors," while in the USP-Tucson SHU, in part because he was in the SHU so often. (Doc. 138 at 9, 23.) Ellis testified that he retrieved the "first couple" of razors from his property located in a storage room. (*Id.* at 18.) He could only access the storage room with the assigned property officer who possessed the key to the room. (*Id.* at 18-19.) The property officer was supposed to inventory and search Ellis's property before allowing him to return to his cell. (*Id.* at 19.) Ellis testified that he also purchased razors from other inmates. (*Id.* at 23.)

Ellis testified that he "kept new razors" by exchanging his old razors for new ones with Officer Vasquez. (*Id.* at 18-19, 21-24.) Ellis explained how he and Officer Vasquez exchanged razors:

> [I]f we're outside, we're in rec cages, and, you know, they got – it's little squares. We're not behind any solid doors. So he would always want – with me, anyway, he would always want the old razor first before he gives you the new razor. So it has to be a back-and-forth. As far as on the inside, it's the same thing. He would have to bend down, pick the razor up. He's going to go look to see if the blade is still in there, make sure you're not giving him an empty razor that you popped the blade out. Then once he checks and there's a blade in there, he'll come and give you the razor.

(*Id.* at 21-22.) Ellis's testimony on this point was lucid, forthright, and highly detailed. Ellis's credibility on this point was enhanced by his willingness to admit to his own wrongdoing. Officer Vasquez testified that he did not give a razor to any inmate. (*Id.* at 31-32.) But when asked by defense counsel if he ever gave a razor to an inmate named

- 3 -

Cody Waters, Vasquez responded, "No. He didn't like me, so I wouldn't give him a razor." (*Id.* at 31.) Although Vasquez clarified that he "[s]till wouldn't give him a razor" if the inmate liked him, this peculiar testimony was not helpful. (*Id.*) The Court finds Ellis's testimony that Officer Vasquez traded him old razors for new ones credible.

Officer Vasquez testified that he would personally pass items between inmates, including books, hygiene, and some standard items that inmates coming into the SHU may not immediately receive. (*Id.*) He testified that when passing items between inmates, he would first "always search through" the item to ensure it did not contain contraband. (*Id.*) Ellis testified that Officer Vasquez "used to pass a lot of stuff" between Ellis and other inmates because some officers, including Officer Vasquez, would do small favors for inmates if they were in the SHU long enough. (*Id.* at 9.) While in the SHU, Plaintiff and Ellis often exchanged possessions, including newspapers, postage stamps, and coffee. (Doc. 47-3 at 22; Doc. 54 at 5; Doc. 138 at 8.)

Sometime before September 14, 2020, Officer Vasquez passed an envelope containing coffee, stamps, and a razor from Ellis to Plaintiff. (Doc. 47-3 at 20; Doc. 54 at 4-5; Doc. 138 at 9-10.) Ellis initiated the transfer as he routinely did— by holding the envelope up to his cell window and asking Officer Vasquez to take the envelope to Plaintiff's cell. (Doc. 47-3 at 16, 20; Doc. 54 at 4-5; Doc. 138 at 9-10.) Officer Vasquez then opened Ellis' food slot, grabbed the envelope, examined its contents, and delivered it to Plaintiff.[5] (Doc. 47-3 at 16, 20; Doc. 54 at 4-5; Doc. 138 at 9-10.) The Court finds Ellis's testimony credible on this issue.

Defendant asserts that "it is unknown how or from whom Plaintiff obtained" the razor. (Doc. 127 at 3.) Defendant specifically contests Plaintiff's trial testimony that she and inmate Ellis "fished"[6] notes one or two days prior to Plaintiff cutting herself, and that

---

[5] The Court inquired whether Ellis ever did anything to cause Officer Vasquez to do favors for him. (Doc. 138 at 10.) Ellis testified that, as one example, he once took a cellmate late at night as a favor to Officer Vasquez although he "didn't normally take cellies." (*Id.* at 10-11.) Ellis did this because Officer Vasquez was "always doing stuff for [him]." (*Id.* at 10.)

[6] Officer Vasquez testified that "fishing" is a term used to describe a method inmates use to pass items between cells that are typically located on the same range. (Doc. 138 at 30-31.) Fishing involves creating a line usually made from sheets, shirts, or other materials;

- 4 -

Ellis communicated through these notes that he would send Plaintiff a razor and other items. (Doc. 127 at 4; Doc. 137 at 39; Doc. 138 at 39.) Defendant is correct that, contrary to Plaintiff's assertions, evidence in the record established that Plaintiff and Ellis were not housed on the same range at the relevant time. (Doc. 138 at 34-38, 71.) Plaintiff and Ellis's cells were on different ranges, between which it would be nearly impossible to fish notes. (Doc. 138 at 39-42.)

However, the Court need not rely on Plaintiff's testimony that she fished notes with Ellis on the days leading up to the incident to conclude that Officer Vasquez delivered the envelope containing the razor. Officer Vasquez testified that he would personally pass items between inmates. (Doc. 138 at 31.) Ellis testified that Officer Vasquez "used to pass a lot of stuff" for him. (*Id.* at 9.) Ellis described in detail how he would initiate a transfer of items with Officer Vasquez. (*Id.* at 9-10.) Ellis also testified that he often shared items with Plaintiff. (*Id.*) Based on this testimony, the Court finds that Ellis initiated the delivery with Officer Vasquez, whether or not he fished a note to Plaintiff beforehand. The Court further finds that Officer Vasquez searched through the package, as he testified was his practice when passing items for inmates, but that he failed to see the razor.[7] (*Id.* at 31.)[8]

### D. Plaintiff Cuts Herself

On September 14, 2020, Plaintiff expressed having thoughts of self-directed violence. (Doc. 127 at 1-2; Doc. 137 at 108-109.) As a result, Dr. Licata, Plaintiff's treating psychologist, performed a Suicide Risk Assessment on Plaintiff. (Doc. 127 at 2;

---

tying something weighty to the end; and using the line to pass items, such as notes, coffee, and newspapers. (*Id.*)

[7] Defendant argues that Plaintiff's version of events is not credible, in part because she did not identify Officer Vasquez as a tortfeasor in her discussion with Dr. Licata, discussed below, in her tort claim form (SF-95), or in her First Amended Complaint. (Doc. 127 at 4.) It is unclear why Plaintiff chose not to name Officer Vasquez initially. Plaintiff may have chosen not to name Officer Vasquez because the two maintained a positive relationship. Plaintiff testified that she "genuinely like[s] Officer Vasquez," and that he is a "funny, charming, kind, helpful individual." (Doc. 138 at 65-66.)

[8] The Court also rejects Defendant's argument that Plaintiff and Ellis's account is implausible because Officer Vasquez was not working in the SHU on September 12, 2020, or September 13, 2020, when Plaintiff testified he gave her a razor. (Doc. 127 at 4.) It is reasonable to believe Plaintiff may not be aware of the exact date, particularly because passing items appears to be a regular occurrence. Moreover, the question is whether Officer Vasquez handed Plaintiff a razor "sometime before September 14, 2020," not on an exact date. (Doc. 70 at 2.)

Doc. 137 at 38, 108-109.)  During the Assessment, Plaintiff immediately expressed significant frustration with her prolonged SHU placement and what Plaintiff perceived as a delay in her pending transfer to another institution.  (Doc. 47-4 at 11; Doc. 127 at 2; Doc. 137 at 109, 111.)  Although Plaintiff identified suicidal ideation, the plans were unrealistic and grandiose[9], which Dr. Licata opined significantly decreased Plaintiff's suicide risk.  (Doc. 47-4 at 11; Doc. 137 at 116.)  Dr. Licata noted that Plaintiff presented as highly future-oriented.  (Doc. 47-4 at 11; Doc. 137 at 114, 116-117.)  Ultimately, Dr. Licata found Plaintiff to be receptive to treatment interventions and determined suicide watch was not warranted.  (Doc. 47-4 at 11; Doc. 137 at 117.)

On September 15, 2020, Plaintiff reported using a dime-sized portion of a loose razor blade to cut herself 243 times.  (Doc. 47-4 at 18; Doc. 126 at 1.)  Plaintiff handed over the razor to staff upon request.  (Doc. 47-4 at 18; Doc. 127 at 2; Doc. 137 at 91-92.)  That morning, Dr. Licata performed another Suicide Risk Assessment on Plaintiff and observed the cuts Plaintiff made to her face, legs, hand, and arms.  (Doc. 47-4 at 18; Doc. 127 at 2; Doc. 137 at 88.)  Dr. Licata noted that many of the cuts were less than an inch; all were superficial, not life-threatening or bleeding, and none required stitches.[10]  (Doc. 47-4 at 18; Doc. 126 at 4; Doc. 127 at 2; Doc. 137 at 24, 120-121.)  Dr. Licata did not count the cuts, nor did any staff member.  (Doc. 127 at 2; Doc. 137 at 88.)  Plaintiff asked for but did not receive antibiotic ointment.  (Doc. 137 at 24.)  Plaintiff did not request to see medical personnel.[11]

Dr. Licata's contemporaneous notes from the Assessment state:

> When queried as to what happened, Ms. Pinson indicated that she was sitting in her cell last night, ruminating over ways in which she can bring attention

---

[9] When Dr. Licata directly questioned Plaintiff about thoughts of suicide and self-directed violence on September 14, 2020, Plaintiff stated that she thought about cutting her abdomen open and draping the cell with her intestines, and using a gun and a bullet if she had access.  (Doc. 47-4 at 11; Doc. 137 at 109, 128.)

[10] At trial, when queried about what she meant by "superficial cuts," Dr. Licata explained that "superficial cuts are non-lethal…they can be long in length, but they're not deep.  They don't require medical attention.  They may not even break the skin to cause blood loss.  Kind of like a paper cut."  (Doc. 137 at 120-121.)

[11] Plaintiff testified that she requested antibiotic ointment "with the intent that [Dr. Licata] call medical personnel to attend to [Plaintiff's] injuries."  (Doc. 137 at 24.)  However, Plaintiff did not testify that she requested to see medical staff.

to her prolonged SHU placement. She stated being inspired by "body art," and thus decided to create a "visual" by inflicting 243 superficial cuts; a cut for each day she has been in SHU. She added "I wanted to illustrate what I'm going through, a visual of my suffering." Ms. Pinson displayed cuts above her left eyebrow, cuts on the back of her left hand, cuts on her left wrist, cuts on her left forearm, and a majority of cuts on her right calf. Ms. Pinson stated "This is more for the people on Thursday," suggesting she wants to display her cuts for Executive Staff during rounds. When further queried on her why [sic] she engaged in this behavior, she endorsed being invalidated by Executive Staff last week when she informed them that she had been in SHU for nearly 250 days. She felt that staff did not "fully understand the gravity" of her situation, and therefore she created a "visual."

(Doc. 47-4 at 18.) Dr. Licata's notes reflect that Plaintiff was frustrated that Dr. Licata was called. (Doc. 47-4 at 18.) When asked at trial to elaborate on that frustration, Dr. Licata testified that Plaintiff "felt like it was a waste of [Dr. Licata's] time and that ultimately [Plaintiff] wanted to bring this attention to the executive staff, the warden, in an effort to facilitate a faster transfer." (Doc. 137 at 119-120.) During the Suicide Risk Assessment, Plaintiff explicitly and adamantly denied suicidal ideation, intention, or plan. (Doc. 47-4 at 18; Doc. 137 at 121.) Dr. Licata determined that Plaintiff was neither suicidal nor at imminent risk of self-harm. (Doc. 137 at 87, 92-93.)

At trial, Plaintiff testified that the "executive staff made [Plaintiff] very angry." (Doc. 137 at 21.) Plaintiff explained that during the executive staff's walk through the SHU, an executive assistant "made a statement that was very upsetting to [Plaintiff]." (*Id.* at 22.) Plaintiff then "ruminated on [her] overall situation," her desire not to be housed in the SHU, and her belief that it was unnecessary for her to be housed in the SHU. (Doc. *Id.* at 21-22.) Plaintiff explained that she cut herself to deal with the stress, which she characterized as a "maladaptive coping mechanism." (*Id.* at 22.) Plaintiff did not suffer any lost wages and incurred no medical expenses. (*Id.* at 39.)

### III.     Applicable Law

Under the FTCA, the United States may be liable for injury caused by the negligent act of "any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission

occurred." 28 U.S.C. § 1346(b)(1). "[R]eference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA." *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994). Because Plaintiff's injuries occurred in Arizona, Arizona substantive law applies here.

To prevail on a negligence claim under Arizona law, a plaintiff must prove by a preponderance of the evidence "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). Whether a duty exists is a matter of law, while breach, causation, and damages are factual issues. *Id.*

### A.   Defendant Owed Plaintiff a Duty

A duty is an "obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Id.* Arizona law recognizes a duty of care arising from a "special relationship" between the defendant and plaintiff, such as "jailer-prisoner." *Wertheim v. Pima Cnty.*, 122 P.3d 1, 3 (Ariz. App. 2d Div. 2005).

Defendant does not contest that "Officer Vasquez owed Plaintiff a duty to conform to the standard of care of a jailer, which is to take reasonable action to protect the prisoner against unreasonable risk of physical harm." (Doc. 70 at 2.) The Court finds that Officer Vasquez owed Plaintiff a duty.

### B.   Officer Vasquez Breached his Duty of Care

"[I]n negligence cases, the duty [if it exists] is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Coburn v. City of Tucson*, 691 P.2d 1078, 1080 (Ariz. 1984) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 356 (5th ed. 1984)).

Plaintiff contends that Officer Vasquez breached his duty of care to take reasonable action to protect Plaintiff against unreasonable risk of physical harm by handing her an envelope containing a razor. (Doc. 126 at 3-4; *see also* Doc. 70 at 2.) Defendant contends

Officer Vasquez did not hand Plaintiff a razor and did not breach his duty of care.

Based on the evidence in the record, the Court concludes that Officer Vasquez handed Plaintiff an envelope containing a prohibited razor. As a result, Officer Vasquez breached his duty of care to take reasonable action to protect Plaintiff against unreasonable risk of harm.

### C. There is a Causal Connection Between the Defendant's Conduct and the Resulting Injury

Causation requires showing that the breach was both the cause-in-fact and the legal or "proximate" cause of the alleged injury. *Boisson v. Arizona Bd. of Regents*, 343 P.3d 931, 934 (Ariz. App. 2015). Cause-in-fact exists "if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act." *Ontiveros v. Borak*, 667 P.2d 200, 205 (Ariz. 1983) ("the general rule is that a defendant may be held liable if his conduct contributed to the result and if that result would not have occurred 'but for' defendant's conduct."). Legal or proximate cause requires showing an unbroken, foreseeable chain of events between the defendant's actions and the ultimate harm. *Id.* Thus, even where cause-in-fact is shown, a defendant may not be held liable for the plaintiff's alleged injuries if the causal chain is broken or superseded by an intervening cause that is "both unforeseeable and extraordinary." *Id.*

Defendant argues that there is no causal connection between Officer Vasquez's conduct and Plaintiff injuring herself because Officer Vasquez did not provide the razor. (Doc. 127 at 5; Doc. 138 at 74.) Defendant also contends that Plaintiff's stated goal in cutting herself was to "create a visual of her suffering." (Doc. 127 at 2-3; Doc. 138 at 73.) Defendant appears to argue Plaintiff's behavior constitutes an "extraordinary action" that breaks the causal chain. (*See* Doc. 127 at 6-7.)

For a plaintiff to show cause-in-fact, a "[d]efendant's act need not have been a 'large' or 'abundant' cause of the final result; there is liability if the result would not have occurred but for defendant's conduct, even if that conduct contributed 'only a little' to plaintiff's injuries." *Ontiveros*, 667 P.2d at 205 (internal citation omitted).

- 9 -

The Court finds that "but for" obtaining a razor from Officer Vasquez, Plaintiff would not have inflicted the injuries at issue upon herself or made such a substantial number of cuts. Unlike other items Plaintiff may have accessed, razor blades are designed to cut. Furthermore, even if it was not foreseeable to Officer Vasquez that Plaintiff would use the razor in the precise way she did, given Plaintiff's history of suicidal ideation and self-harm, and the prohibited status of razors in the SHU, it was reasonably foreseeable that providing Plaintiff a razor would result in Plaintiff using the blade to inflict some form of harm on herself. This Court has previously emphasized the Arizona Supreme Court's recognition in the "dram shop" context that "[c]ommon sense, common experience and authority all combine to produce the irrefutable conclusion that furnishing alcohol, consumption of alcohol and subsequent driving of a vehicle which is then involved in an accident are all foreseeable, ordinary links in the chain of causation leading from the sale to the injury." *Ontiveros*, 667 P.2d at 207. The Arizona Supreme Court has applied the same reasoning to other circumstances. "For instance, one who lends an automobile or dangerous instrument to an inexperienced or intoxicated person may be held liable for injuries inflicted by that person upon another." *Id.* at 209 (citing cases).

Similarly, here, Plaintiff's own harmful conduct, which ultimately caused her injuries, does not constitute a superseding event sufficient to relieve Defendant of liability. As in the dram shop context, "the common law recognizes a duty to take affirmative measures to control or avoid increasing the danger from the conduct of others." *Ontiveros*, 667 P.2d at 208−09. The Court's conclusion is supported by USP-Tucson policy restricting SHU prisoners' access to razors. It is further strengthened by Officer Vasquez's first-hand testimony that incidents of inmates harming themselves with razors went down after the implementation of the no-razor policy, but that there are still so many incidents of razor misuse that he cannot quantify them. (Doc. 138 at 59-60); *see Ontiveros*, 667 P.2d at 208 ("the existence of an unreasonable risk of harm . . . becomes most obvious when the actor has reason to know that he is dealing with persons whose characteristics make it especially likely that they will do unreasonable things" (internal quotation marks omitted).

Based on the foregoing, the Court finds that Officer Vasquez breached his duty of care by providing Plaintiff a razor, and this breach was both the but-for and proximate cause of Plaintiff's injuries.

### D.    Damages

Defendant argues that Plaintiff did not sustain any damages from her voluntary actions.  (Doc. 127 at 5.)  Plaintiff requests damages in the amount of one dollar.  (Doc. 138 at 67.)

"[T]he measure of damages under the Federal Tort Claims Act is based on state law." *Felder v. United States*, 543 F.2d 657, 663 (9th Cir. 1976) (citing 28 U.S.C. § 2674). Under Arizona law, a plaintiff generally may recover for all damages she sustained "as the direct, natural and proximate result" of negligence, as long as those damages "are established with reasonable certainty." *Contl. Life & Acc. Co. v. Songer*, 603 P.2d 921, 931 (Ariz. App. 1st Div. 1979).  "Arizona allows unlimited recovery for actual damages, expenses for past and prospective medical care, past and prospective pain and suffering, lost earnings, and diminished earning capacity." *Wendelken v. Super. Ct. In and For Pima Cnty.*, 671 P.2d 896, 899 (Ariz. 1983); *Nunsuch ex rel. Nunsuch v. United States*, 221 F. Supp. 2d 1027, 1034–35 (D. Ariz. 2001).  When actual damages are a necessary element of the cause of action, as in negligence claims, then "nominal damages cannot be awarded." *Vivian Arnold Realty Co. v. McCormick*, 506 P.2d 1074, 1079 (Ariz. App. 1973).

The evidence in the record establishes that Plaintiff's cuts were minor, superficial, not bleeding, and not requiring stitches.  Plaintiff did not request to go to the hospital, incurred no medical expenses, and did not suffer lost wages. Furthermore, Plaintiff's mental state appeared relatively unchanged after she made the cuts.  However, the cuts were physical injuries, even if minor, and they caused at least some pain and suffering. Given the superficial nature of the cuts, the Court finds that Plaintiff suffered damages equal to $1.00 per cut, for a total of $243.00.

. . . .

. . . .

- 11 -

### IV. Plaintiff's Motion for Access to Transcripts for Use on Motion for a New Trial and/or Future Appeals

Plaintiff filed a Motion for Access to Transcripts for Use on Motion for a New Trial and/or Future Appeals. (Doc. 139.) Plaintiff requests that the Court provide her with transcripts of the bench trial at no expense because she is "anticipating a motion for a new trial" and "a possible appeal." (*Id.*) Plaintiff purports to bring her Motion pursuant to Ninth Circuit Rule 30-3 and 28 U.S.C. § 753(f). (*Id.*)

Ninth Circuit Rule 30-3 provides that, in cases involving pro se appeals by prisoners proceeding in forma pauperis, the clerk of the district court shall provide to the prisoner, at no charge, copies of documents comprising the excerpts of record "within 21 days from the receipt of the prisoner's written request." Here, no appeal is pending, and Plaintiff's request is premature under Ninth Circuit Rule 30-3. Plaintiff's request is also premature under 28 U.S.C. § 753(f), as there is no pending appeal and no certification that the appeal "presents a substantial question." Accordingly, the Court will deny Plaintiff's Motion as premature.

**IT IS ORDERED** that the Clerk of Court shall enter judgment in favor of Plaintiff in the amount of $243.00, and close this case.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Access to Transcripts for Use on Motion for a New Trial and/or Future Appeals (Doc. 139) is **denied without prejudice**.

Dated this 28th day of March, 2024.

Honorable Rosemary Márquez
United States District Judge